Milligan, J.,
delivered the opinion of the court:
On this state of the record it is contended that the claimant acquired no valid title to the cotton in suit by his purchase, because it was made in violation of the laws of war and the Non-intercourse Act, July 13th, 1861, and the President’s proclamation made pursuant thereto.
The proclamation, which was issued on the 16 th of August, 1861, declared Tennessee and Georgia, with other States, in a state of insurrection, and forbid all commercial intercourse between the same and the inhabitants thereof, with certain exceptions, among which are such parts of the insurgent States as “may be, from time to time, occupied and controlled by forces of the United States engaged in the dispersion of such insurgents.”
The general exceptions under the proclamation just referred to were revoked by the President in his Proclamation 31si March, 1863; but this revocation did not occur until after the purchases in this case were made, so that they fall directly under the Act July 13th, 1861, and the proclamation of August 16, made pursuant thereto. The question, therefore, is whether the purchase of the cotton in suit was illegal under the act of Congress and the proclamation of the President.
The State of Georgia, where the cotton was purchased, on the 16th of January, 1863, is admitted to have been, at that time, one of the insurrectionary States, and all commercial intercourse was declared unlawful between the inhabitants of the same and the inhabitants of other parts of the United States not in insurrection, or persons residing in parts of the insurgent States occupied and controlled by forces of .the United States engaged in the dispersion of such insurgents.
*468 This act of Congress, and the proclamation made under it, are bnt a re-assertion of the principles of public law practiced among all civilized states, and followed by the uniform current of American decisions. These principles have been so often announced and applied by this court and the Supreme Court, that it requires no extended argument to show their application to this case.
The only point of difficulty is to ascertain judicially whether the inhabitants of insurgent territory alternately raided on by both belligerent parties, but not permanently occupied by either, are debarred the privilege of trading with the insurgents, when they can do so without crossing any of the regular or established military lines of Federal occupation.
Both on reason and authority we think it clear that the inhabitants of States declared in insurrection, and thus situated, could, at that time, lawfully carry on commercial intercourse with other parts of the insurgent States. The prohibition imposed by the words of the proclamation, “ from time to time occupied and controlled,” &c., must be held to mean more than a mere raid or transient occupation. The occupation intended by the President, and implied by the law, was an actual, not an illusory, but substantial and complete occupation.
In the case of The Venice, (2 Wall. R., p. 258,) the Supreme Court, while speaking of this question, say:
“ The legislative and executive action related, indeed, mainly to trade and intercourse between the inhabitants of loyal and the inhabitants of insurgent parts of the country; but, by excepting districts occupied and controlled by national troops from the general prohibition of trade, it indicated the policy of the Government not to regard such districts as in actual insurrection, or their inhabitants as subject, in most respects, to treatment as enemies. Military occupation and control, to work this exception, must be actual; that is to say, not illusory, not imperfect, not transient, but substantial, complete, and permanent. Being such, it draws after it the full measure of protection to persons and property consistent with a necessary subjection to military government. It does not, indeed, restore peace, or, in all respects, former relations, but it replaces rebel by national authority, and recognizes, to some extent, the conditions and responsibilities of national citizenship.”
On the interpretation here given it is obvious that the claim *469 ant, while occupying disputed ground, had no legal authority, to trade with the inhabitants of the loyal States; and to deny him the right of commercial intercourse with the people of the insurgent States would be not only to contravene the repeated decisions of the Supreme Court, but to destroy his capacity to contract altogether. Such a condition of things was certainly never intended either by the legislative or executive department of the Government. It follows, therefore, as a necessary logical consequence, that the rights of the claimant in respect to commercial intercourse were not changed until the country where he resided was so permanently and completely occupied and controlled by the United States military as to draw after it the full measure of protection to his person and projierty, consistent with a necessary subjection to military government.
The only remaining question is to ascertain the price per bale at which the claimant ought to recover. Usually this is a matter of little difficulty, but when connected with cotton coming from Atlanta and other parts of Northern Georgia, it has been found to be full of perplexity. In Price’s Case (7 C. Cls. R., p. 576) this court, after great labor and research, classified the different lots of cotton, as far as could then be ascertained, and affixed to each the appropriate price per bale; but since that time some few additional captures, not then known, have been brought to light, which have in some degree continued the difficulty that existed in all the cases before the decision in Price’s Case.
In this case a further examination into the quantity sent forward by Captain Brown, in December, 1864, to the supervising agent at Cincinnati, shows 63 bales instead of 42, as reported in Price’s Case under the eighth fund. The claimant’s cotton was included in the last sales made in Cincinnati, and realized $249 net per bale. We hold him, therefore, entitled to recover the net proceeds of 57 bales, at $249 per bale, amounting to the sum of $14,193; for which judgment will be entered.